The Chief Justice delivered the opinion of the court.
Under an act of the legislature, passed the 11th day - •of February, 1813, for the improvement of the meadows, marshes and swamps, lying within certain prescribed bounds, in the Upper Township of the county of Cape May, An embankment, with other necessary water-works, was made, and has been from time to time maintained and repaired. The expenses of the erection of the bank and works, were defrayed, as directed in the act, by an assessment on the owners and possessors. For the subsequent repairs, assessments have been, from time to time, made and collected by the managers. In the year 1827, they made the seventeenth, and in the year 1828, the eighteenth. *36 assessment. Each was for fifty cents an acre; and Samuel McCarty, the plaintiff in certiorari, was charged as an owner, as he had been on every assessment from the commencement of the enterprise. Nearly the whole of the seventeenth assessment, he paid. The residue, and the whole of the eighteenth, he refused. Under a provision in the act, authorizing, if any of the owners or possessors neglect or refuse to pay the sum assessed, the managers to recover the same in an action of debt, in any court having, cognizance thereof, Joshua Brick and Joseph Sutton, the managers, instituted a suit and obtained judgment in the court for the trial of small causes, for the sums unpaid, with costs. McCarty appealed. On the hearing of the appeal, the assessments with the return and plats, or maps, whereby “they were said to have been made, among other proofs, were in evidence; and judgment was again given in favor of the managers. This judgment of the Court of Common Pleas, *28] McCarty seeks to reverse, on the *ground that the assessments, for several reasons, were illegal. In the course of the argument, some remarks were made on the refusal of the court to receive the evidence offered by the appellant to shew that he was not benefitted by the bank. I do not propose, however, separately to examine this point, because, as I understood, it was as a distinct reason for reversal expressly, a.nd I think properly, waived; and was urged only to illustrate and strengthen the other grounds of argument of the plaintiff’s counsel. The assessments are impeached, in the first place, because of the alleged insufficiency and invalidity of the return and maps of each owner or possessor’s share of the marsh and meadow, whereby the managers professed to have made, and were required to make, the assessments ; and in the second place, because the assessments do not conform either to the return or maps, if proper, or to the provisions of the act.
1. It is objected that the surveyor does not appear, and is not shewn, either by the documents produced, or by *37 extrinsic evidence, to have fulfilled, in divers respects, the duties required by the legislature. In examining the specified deficiencies, it will be necessary at the outset to ascertain the services ho was to perform. They are prescribed in the second section of the act, in the following terms : “It shall be the duty of the managers chosen as aforesaid, to employ a well known and respectable surveyor in said township, who shall forthwith, upon the receipt of this act, proceed to measure and determine each owner or possessor’s number of acres of marsh and meadow, and make a regular return plat and drawing ot the same, which shall bo given to the said managers, and shall remain in their possession during tlieir .continuance in office; and upon the expiration of such time, tobe delivered to their successors in office; such return of the so-to-be appointed surveyor, shall be received as evidence of each person’s possessions, and all assessments and votes shall be made thereby.” Soon after the first managers were chosen, they employed a surveyor, Nicholas Willets, who prepared and delivered to them a book of maps and descriptions, which furnished the professed guide in the first and all subsequent assessments, and was produced in evidence on the trial of this cause. The conformity of this book or return, to the directions of the act, is now i,o be the subject of examination. It is *said thero is no proof on this [*29 book, or return, or in any other way that the surveyor measured and determined each owner’s or possessor’s number of acres, or in any wise determined or adjudicated ■either the quantity of land, or the persons who were to be benefited by the bank, and therefore to be included in the assessments and subjected to the charges of the undertaking. Neither the time nor the source of this exception, can serve to commend it, although most certainly neither should give it, any prejudice. Samuel McCarty was an original, .and appears to have been an active, member of the company. Fie partook in the call of one of the earliest meetings. He attended and voted at almost all occasions. He *38 has been, prior to the present controversy, in common with the other owners, sixteen times assessed, and has paid from time to time his assessments, sometimes in money, and' sometimes in labor. So far as appears in the evidence and documents before us, the members of the company, however they may have differed as to the policy or expediency of’ particular repairs or improvements, have, without question, acquiesced in the fairness, fullness, and accuracy, of the maps and surveys, and the propriety of the respective assessments antecedent to the present controversy. These-facts are chiefly gathered from the books kept under the-requisition of the tenth section of the act, which are therein-directed to be laid before the company at their annual meetings, as by the entries seemd have been repeatedly,.if not-uniformly, done; and which are, therefore, for purposes of this kind, as respects the members of the company, a legitimate source of information.
The book, or return, is in the' hand-writing of Nicholas Willets, the surveyor. It is' thus entitled, “ Surveys of the meadows about to be banked on East and Dennis Greek,, made in June, A. D. 1813, by Nicholas Willets.”
And at the close is the following entry : “ Done at the-immediate request of the managers in June,- A. D. 1813, by
Nicholas Willets.”
The maps and descriptions are, in general, on separate- and distinct pages of the book in which they are collected. At the top of the page is written the name of the owner. As on page 7, "Thomas Broadrick’s Marsh.” Below is-found a map or plat upon which are figures, after the man-*30]' ner of surveyors, to denote *the quantity. Beneath-is. a description in writing, giving the place of beginning, the-courses and distances, anct frequently the remarkable-points or places of natural or artificial boundary, and setting-forth the quantity usually in figures, but in two instances at least, in words at length. In some instances, where the-tracts of two, or sometimes three, owners lay adjoining,. *39 they are exhibited on the same map, but designated and divided on the face of the map, as well as in the subjoined descriptions.
In the work thus performed by the surveyor, I cannot discern the alleged deficiency; but, on the contrary, there appears to me a substantial, and for all valuable or desirable purposes, a full compliance with the injunctions of the act. The surveyor says these are surveys made by him, and at the immediate request of the managers, in June, 1813, and he sets forth the quantity of each. It is true, he does not, adopting the precise language of the act, say, that he has measured and determined each owner’s or possessor’s number of acres ; but he says he made surveys of the meadows, and he states the quantity and result of his surveys. Although the words, survey and measure, are not, as was remarked by the plaintiff’s counsel, precisely synonimous; yet, if he surveyed the lands and ascertained the quantity, lie necessarily measured them. He has, therefore, used expressions of equivalent import with those contained in the act.
The surveyor" does not, it is true, certify that those are the owners of the marsh and meadow included within the bounds of the bank designated by the legislature, and who are to be benofitted thereby; nor am I satisfied there is anything in the act requiring him to make such certificate. But he seems to have done what is equal to it, and all that is enjoined on him by the section prescribing his duty. Upon receipt of the act he was to proceed to measure and determine each owner’s or possessor’s number of acres of marsh and meadow, and make a regular return plat or drawing of the same, which shall be given to the managers, and shall remain in their possession.” He made a return to the managers with plats of divers tracts of marsh and meadow, and their respective quantities. Being charged to measure each owner’s marsh or meadow, his act in returning these maps and *40 descriptions, is equivalent to a certificate that, according to his judgment, these are the owners contemplated by *31] *the law, and intended to be included in the bank and company; and especially when taken in connection with the endorsement or title given by him in the words, “ Surveys of the meadows about to be banked on East and Dennis Creek.” The managers considered the work of the surveyor to have fulfilled the law. In their book is the following entry: “The managers .proceeded and employed Nicholas Willets, a respectable surveyor, and two chain bearers, for the purpose of ascertaining the number of acres of marsh that each owner possessed.” “June 24, Mr. Willets proceeded to run out said marsh by the directions of the managers, and completed the same with regular maps and drawings thereof, according to law, and the said surveyor's book of maps in the hands of the managers.” And this book was from time to time laid before the company. So likewise were the accounts of the managers, including of course, the assessments, which from year to year received the sanction of the company. It is said, however, there is some proof that he did not measure or survey the marsh, or all of it; and this proof is supposed to be found in pages 8 and 11 of the book of maps. Under the head or title of “ John Goff’s marsh,” on page 8, is placed a map, and below is a description of a tract of somewhat more than 18 acres. On the same page is a map of a small tract, with these words attached to it, “ Not run by me, N. Willets ;” and a note at the foot of the page in these words, “ The small draft above is a piece of marsh belonging to John Goff, in Learning’s landing turn. The courses and distances I had from the deed which are not such as will come together. But, being bounded by the creek on all sides but one, the quantity will remain the same, and can be ascertained at any time hereafter if necessary. The courses and distances give 3. 0. 10.” The reason for omitting tQ survey this lot, if a part of the marsh, or of noticing *41 it, if not, is not explained. It is said to belong to Jolm Goff, but it was not charged to him in the first assessment ; which contained 59a. 2q. 20p., the amount of the lots described on pages 8 and 11. From the remarks of the surveyor, .the inference of the counsel of the plaintiff seems not to follow. He had made this lot an exception, by specially noticing that it was not run out. An observation utterly useless, and without point, unless the lot was, in this respect, an exception; and giving the fair conclusion that the other lots *had actually been surveyed by him. [*32 The remark on page 11 does not shew that the surveyor had not ascertained the quantity of the piece above the bridge, there mentioned, and if it was not equal to the quantity of the creek, as supposed by the surveyor, Goff only could complain of being rated for somewhat too large an amount.
It was further objected to these maps, that they do not set forth the quantity of acres, and as proof, reference was given to the map of John Goff. In the map are the figures 18, 1, 20, ami at the close of the description, are the words and figures ‘ to the beginning containing, 18, 1, 20, and several, perhaps, most of the others are in the same manner. Here, then, it is said, there are neither words nor indicia to shew that acres, quarters or roods and perches, are meant, and consequently there is no specification of quantity, and the surveyor has not, as required by law, determined the number of acres. If the map was exhibited to a person wholly unacquainted with the subject, lie would, it may be supposed, bo unable to comprehend it; and so “ N. 46 W.” and most other parts of the map and description would be unintelligible jargon to him. But if he possessed oven that small portion of geometrical science which belongs to almost every man of any business or experience, he would, at a glance understand without indicia, the meaning of the figures as they stand placed on the maps, where they are never used but with one and the same signification. There *42 are other sources of information and explanation so direct and lucid as to leave no risk of error or ignorance. Over the figures on the first map are the indicia “ Acres, qrs. prs.” sufficiently intelligible to every capacity; and all will understand the figures on the other maps, ip the like situation, as used w’ith the same intent. The figures at the close of the several descriptions, where the contents in acres and aliquot parts of an acre, are usually expressed, cannot fail to be understood, especially when taken in connection with the same figures similarly set down in the body of the maps. Upon the return of .Thomas Learning’s map, page 12, some comments were made. In this instance the surveyor, instead of giving the courses and distances, as in the others, in a description subjoined to the draft, has on the plat marked the beginning station, and placed the courses and distances on the correspondent lines, and within the *33] *draft has subtracted four acres from five hundred and one acres two quarters, leaving a balance of four hundred and ninety-seven acres two quarters. Every one accustomed to business will read this map with readiness; and I see in it nothing insufficient, unintelligible or condusive to error. There is not, it is true, as was remarked by the counsel for the plaintiff, a formal certificate of the quantity of Learning’s marsh; but we find what is equally intelligible, and, therefore, equally subserves the purpose of the act, a map or draft, the courses and distances, and the contents expressed in a manner familiar to all who have even a slight acquaintance with the subject. Nor is there anything uncertain or equivocal in the map of Thomas Ludlum’s marsh, to which our attention was pointed. The quantity has once, and perhaps at first, been set down at 364 acres, which has been erased and three hundred and sixty-eight acres written. According to the latter numbers the assessments on this tract were uniformly made, while it continued in one body and under the original owner. If overrated, however, he might have cause of complaint, no other person ould thereby be subjected to the slightest injury.
*43 It was further said that the return or book of the surveyor does not show that all the meadow and marsh was surveyed. Now he was directed by the act to measure and determine all, and return a plot or drawing of each part. He has made and returned a number of surveys and drafts. He has certified them to be surveys of the meadows about to be banked. And he has thereby virtually, if not in explicit terms, shewn that his return contains the whole of the marsh and meadow, which, in his judgment, he was required to measure and draft.
In the last place, it is said, there should have been a general map exhibiting a view of the whole marsh and meadow. The answer to his alleged deficiency is found in the words of the act; which require the surveyor to make a map or drawing of each owner’s marsh or meadow; but in no place direct him to make a map of the whole. It was readily forseen that the whole number of acres, if desired for any purpose, might always be ascertained by the simple process of the addition of the several parts.
In examining those various objections, it has been seen that I have not adopted or applied the rigid rule of construction, proposed by the counsel of the plaintiff in certiorari. I do not think either the act of the legislature, or the proceedings under it, are to be *subjected to such jealous [*34 and severe scrutiny as attends measures of a different character. A valuable and important improvement was here about to be made, for the mutual benefit and common interest of a number of individuals. Singly undertaken, the work could not he accomplished. General powers partaking in some, though a limited degree, of the nature of a corporation, in order to ensure an union and continuance of effort and action, wore indispensable to success. They were granted by the legislature. This grant, or rather this agreement or arrangement of the persons interested, for their common benefit, sanctioned and ratified by public *44 authority, should receive a liberal interpretation, steadily seeking and supporting the substance, and yielding only to such matters of form as are essentially connected with it.
2d. The second class of objections to the assessments, respect the manner in which they have been made, assuming the return of the surveyor to be a valid and legal basis. The first objection is, that the assessments are made on the owners only, when according to the act, they should have been on the owners and possessors. In supporting this objection, the sections of the act have not been, I think, rightly applied. The expense of the original erection of the bank is directed to be assessed and collected from the several owners and possessors; but a subsequent section authorizes the managers to assess and collect the sums necessary for repairing the bank and water works from the owners or 'possessors. Perhaps there is little essential difference; as respects the assessments in question, there is nono; for there is no evidence that any possessor is not an owner. And hence is furnished a conclusive answer to this objection.
In the next place, it is said the assessments are not made according tp the original surveys ; that the persons charged in these assessments are not, in several instances, the persons named as owners in the surveys; that the quantities of acres set out in the individual assessments differ in divers places from those set out in the return, even where the same persons are named, as in the case of the plaintiff in certiorari, who is returned by Wiliets for forty-seven acres, and in the assessments in question, is rated at 42 acres.
Under the provisions of the act, all assessments are to be made, not according to the value 'of the respective tracts, but *3o] in proportion *to the number of acres of each owner ; and the assessments have in fact been made, not by adopting anjr aggregate sum and dividing it among the owners ; but by charging each owner at a rate or sum per acre; sometimes one dollar and at others fifty cents. Hence it *45 will be perceived that an error in charging one owner can do little, if any prejudice, to another. Now the complaint of McOarty is, not that he has been unfairly or disproportionaliy rated, but that errors have been made with respect to other persons, or rather that the propriety of charging them so much, or of charging them at all, is not exhibited on the face of the assessments. It would seem a sufficient answer, that he should complain or rest satisfied according to the merits or demerits of his own case. And the more especially as the managers are held to a severe responsibility, being made liable to forfeit and pay the sum of fifteen dollars for any neglect in any part of their several duties, and also to pay all damages that may arise by their omission ; to be sued for and recovered by any member of the company who shall be aggrieved and injured by such omission or neglect. In our state and county taxes, divers articles of property are assessed at fixed rates, and hence called certainties; yet one citizen would not be excused from the tax.on liis certainties justly imposed, because another liad been charged at only half of the legal rates ; or another, for part only of Ins certainties; or because other persons properly ratable had been entirely overlooked.
Let us, however, examine the facts proposed by this objection somewhat more closely: Samuel McOarty, as already mentioned, is one of tho original owners returned by Willets for 47 acres. In the first fifteen assessments, ho is rated at 47 acres, and these, as already observed, were regularly discharged. At most of the meetings prior to 1825, he attended and voted, according to the ratio fixed in the act for liis quantity, nine votes. In the sixteenth assessment of 1825, he is assessed at 42 acres, and 5 acres are charged to Stacy McOarty ; both assessments were paid. At the next meeting of the company, Samuel McOarty attended, and then voted, according to the same ratio, eight votes. In the subsequent assessments he is assessed for the like quantity. The number of acres returned by Nicholas *46 Willets is 1603a. 3r. 5p. The second assessment made in 1813, was 1603a. 2r. 35p. The number of acres included in *36] the 17th assessment for 1827, is *1627a. Or. 16p., and in the 18th assessment for 1828, is 1622a. 2r. 18p., or really, if certain obvious, errors, unimportant as respects the present subject, are corrected 1627r. Or. 18p. We need not consume time tó explain the cause of the increase of the quantity assessed. By the view thus presented, it is demonstrated .that neither in the quantity charged to McCarty, nor in the proportion between that quantity, either in these or the former assessments, and the whole number of acres contained in the original surveys, is there any error which can work to his prejudice; or perhaps it may be justly said there is no apparent error of any kind.
In point of fact it is true as stated by the counsel of the plaintiff in certiorari, that in the assessments in question are divers names not enumerated as owners in the original surveys, and that where the names are the same, the quantity ■of acres is in some instances changed. But is there any legitimate reasoning wherefrom it can result, that McCarty can be absolved from payment, because some person who owns no marsh has been’ assessed, or some one has been assessed for more than in truth he owns ? This consequence does not follow, even if the position maintained by the plaintiff’s counsel were sound, that these and all other assessments should have been made in exact conformity in all respects with the original surveys, in other words that the same persons should be now assessed and for the same quantities as in the first assessment in 1813, and in the return made by the appointed surveyor. But this position finds no support either in the language or the spirit of the act or of the provisions which it contains. The continuance of the act and of the company are not limited ; changes of ownership by descent and purchase, must therefore have been anticipated. In one of the sections, sale and alienation are mentioned. We cannot admit that notwithstanding such *47 changes the assessments wore intended or are required to be made in the original names and for the original quantities, for the sake only it would seem of creating perplexity and confusion. By one of the provisions of the act the marsh of a deninquent owner may be sold and leased for a term of years. Will it be asserted that the sound construction of the act requires the subsequent assessments to be continued in the name of the original owner ? If so, and for the next assessment, the managers should deem it their duty to bring, as by the act they may, a suit in debt; against whom ? *And for what purpose is the assessment then, as [*37 directed, to be given in evidence ? In, the progress of the argument the plaintiff’s counsel appeared to qualify the position so manifestly untenable, by saying that if the managers may make changes they are bound to shew them to be according to and within the original survey; as, that in place of a quantity surveyed to one individual they have assessed other individuals in consequence of changes. In divers instances the changes of ownership are actually entered on the book of assessments, and a careful and patient examination will trace out the reasons of many of the alterations which appear. Perhaps a continuation' of the entries would have been commendable, from the satisfaction they might have afforded. But they are not required either by the act, or by any imperious motives of convenience. The changes of owners and the consequently necessary alterations of the assessments, would properly and naturally become the subject of enquiry and notice by the managers. They knew the quantity to be assessed, and if they performed their duty, which we are to presume, they would take care that the whole was charged to some persons as owners or possessors. If any person was wrongfully charged, either himself or any member had the ready means of exposing and seeking correction of the error; for the managers were bound to lay the book of assesments before the annual meeting and to produce and shew it to any of *48 the members at any reasonable time, when thereto required. But as already remarked, no individual member could have cause of complaint or justly refuse to pay his own assessment, if for his proper quantity and in his just proportion to the whole, because some other member was too largely rated or some other tract was incautiously assessed to a wrong name.
■ Upon a careful scrutiny we can find no grounds for the reversal of the judgment of the Court of Common Pleas.
Judgment affirmed.